.**Joan M. GRAMLING, Plaintiff,**

v.

**GRIT PUBLISHING COMPANY, et al., Defendants.**

**No. CV–89–1477.**

United States District Court, M.D. Pennsylvania.

July 12, 1991.

---

Brian C. Caffrey, Williamsport, Pa., for plaintiff.

J. David Smith, Williamsport, Pa., Charles R. Hay, Goodell, Stratton, Edmunds & Palmer, Topeka, Kan., for Grit defendants.

John C. Youngman, Jr., Williamsport, Pa., for defendant Sec. Mut. Life Ins. Co. of New York.

## MEMORANDUM

McCLURE, District Judge.

### I.  BACKGROUND

Plaintiff Joan M. Gramling filed this ERISA action [1] to recover benefits which she alleges are owed to her as the beneficiary of her late husband, Gene Gramling,[2] under a group life insurance plan (No. G–2424) issued by defendant Security Mutual Life Insurance Company of New York ("Security Mutual"). Gramling's coverage under the plan [3] was provided by his employer, Grit Publishing Group ("Grit").[4]

In dispute is the amount of the death benefit to which Joan Gramling is entitled

---

**1.** Plaintiff asserts a right to recover under 29 U.S.C. § 1132(a) of the Employee Retirement Income Security Act ("ERISA").

**2.** Gene Gramling died December 5, 1989.

**3.** Grit is the only employer participating in the group insurance plan. (M. Pasnello deposition, p. 26)

**4.** Also named as defendants are two affiliates of Grit, The Grit Publishing Company Group Insurance Plan, and Stauffer Communications, Inc. All three entities are hereafter collectively referred to as the "Grit defendants".

The designated policyholder, Grit Publishing Company, was dissolved effective December 31, 1988. Its successor is Grit Publishing Group. (M. Pasnello deposition, pp. 4 and 25)

under the plan. Gramling claims that she is owed $43,973.28, plus counsel fees and costs, in addition to the $52,546.36. already paid to her under the plan (Pasnello deposition exhibit 13).

There are several motions currently before the court: (1) Security Mutual's motion (Record Document No. 39, filed November 1, 1990) for summary judgment; (2) Grit's motion (Record Document No. 37, filed November 1, 1990) for summary judgment; (3) plaintiff's motion (Record Document No. 67, filed December 12, 1990) to compel discovery; and (4) Grit's motion (Record Document No. 69, filed December 12, 1990) to amend a response to plaintiff's request for admissions.

The court will enter an order granting the following relief: (1) denying the motion for summary judgment filed by Security Mutual; (2) denying the motion for summary judgment filed by Grit; (3) denying the motion to compel filed by plaintiff; and (4) denying the motion to amend filed by plaintiff.[5]

## II. DISCUSSION

### A. Motion for summary judgment standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c):

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, an on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." Celotex, supra at 323 and 325, 106 S.Ct. at 2552 and 2553.

Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the non-moving party." Childers v. Joseph, 842 F.2d 689, 694 (3d Cir.1988), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. Anderson, supra, 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir.1988).

### B. Standard of review under ERISA

In ERISA actions alleging a breach of fiduciary duties, there are two standards of review—which applies depends on the nature of the fiduciary's authority and on the nature of the issues before the court. If the fiduciary has "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the question is whether that authority was exercised in an "arbitrary and capricious" man-

---

5. In ruling on defendants' motions, we considered the pleadings, as well as depositions of, inter alia, Michael Pasnello, Terry Harding, John Brockway and Joan Gramling and extensive documentary evidence submitted by the parties.

ner. 29 U.S.C. § 1132(a)(1)(B). If the fiduciary is not vested with such authority, the court's review of his decision is *de novo*, although the court considers only the documents and evidence before the fiduciary and does not receive additional evidence. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Which standard applies is also affected by the nature of the issues before the court. Some courts have held that if the issues are factual and if there is no evidence of a conflict of interest, bad faith or similar contraindications, the *Firestone* rule mandating *de novo* review does not apply, and an "arbitrary and capricious" standard applies. *Barish v. United Mine Workers of America Health and Retirement Fund*, 753 F.Supp. 165 (W.D.Pa.1990) (Mencer, J.) Other federal courts have adopted the opposite approach and have held that *Firestone* applies to both factual and interpretative (legal) determinations.[6] The Third Circuit declined to decide this issue in *Bruch v. Firestone*, 828 F.2d 134, 144 n. 9 (3d Cir.1987), *aff'd*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80. See also: *Teeter v. Supplemental Pension Plan of Consolidated Rail Corp.*, 705 F.Supp. 1089, 1094 n. 1 (E.D.Pa.1989).

Because we find that material issues of fact preclude resolution of this action by summary judgment, we need not determine at this stage which standard applies to the issue before us.

### C. Motions for summary judgment by Grit and Security Mutual

■ The parties disagree on the application of the plan language governing the calculation of death benefits. The plan states that employees having more than thirty (30) months service at Grit[7] are entitled to a death benefit equal to four times their "Base Annual Compensation" ("BAC") rounded to the next $1,000.00 if not already a multiple thereof. The maximum benefit available is $150,000.00, the

minimum is $5,000.00. BAC is defined by the plan as "the earnings due or accrued over a 12–month period determined by multiplying the applicable factor as below by the earnings for the appropriate frequency of payment of compensation. Bonuses, overtime pay and other extra compensation are not to be included in determining such B.A.C." The plan refers the reader to the following chart as an aid in calculating benefits:

| Multiply by the Following If Compensation is Paid | Factor to Determine B.A.C. |
|---|---|
| Weekly | 52 |
| Bi–Weekly | 26 |
| Semi–Monthly | 24 |
| Monthly | 12 |

(Pasnello deposition exhibit 1, pp. 4–5)

Gene Gramling was employed as an advertising salesman at Grit and received a commission based on a percentage of his advertising sales. He received a draw of $250.00 per week ($13,000.00 per year) and a monthly payment for commissions earned over and above his weekly draw. (M. Pasnello deposition, pp. 77 and 98)

Defendants interpret the plan provisions quoted above to mean that any commissions which Gramling earned over and above his weekly draw are not to be included in calculating his base annual compensation and that his BAC is, therefore, calculated by multiplying his weekly draw by fifty-two. Based on this interpretation, they calculated the death benefit due Joan Gramling to be $52,000.00 (4 × $13,000). (M. Pasnello deposition, pp. 120–21)

Plaintiff disagrees with defendants' assumption, implicit in their calculations, that her husband was compensated with a base annual salary augmented by a commission on advertising sales. She contends that he was compensated exclusively by commissions, such that the only logical interpretation of the plan language is that her husband's BAC equals his total compensation for the year (his weekly draw plus monthly commission payments). Plaintiff contends that the weekly draw which her husband, and all other Grit advertising salesmen re-

---

**6.** For a list of cases following this approach, see *Barish, supra*, 753 F.Supp. at 167.

**7.** Gene Gramling had more than thirty years service at Grit, having been employed there continuously from August, 1951, until his death.

ceived, is an advance against the commissions which they expect to earn by the end of the month, not a base salary. Under the circumstances, therefore, plaintiff contends that defendants cannot logically assert that the exclusion of commissions from the calculation of BAC was meant to apply to employees in her husband's position who were compensated exclusively by commissions. This interpretation, she argues, if carried to its logical extension, would result in the denial of any death benefit to the beneficiaries of commissioned employees, and Grit has admitted that that was not its intent. (Record Document No. 50, pp. 23–24, and 29–30)

The parties disagree on a central factual issue which controls the outcome of the case: whether Gene Gramling received a base salary augmented by commissions or was compensated exclusively by commissions against which he received a weekly draw. Since there is some evidence of record supporting the respective positions of both sides, summary judgment is not appropriate.

Grit supervisory employees have made conflicting statements about the character of Gramling's compensation. Michael Pasnello, manager of administrative services at Grit, testified that advertising salesmen receive a base salary supplemented by commissions. (M. Pasnello deposition, pp. 3, 119–21)

Terry Harding characterized Gramling's compensation in the same vein. (T. Harding deposition, pp. 4–10) Harding is the advertising manager of Sunday Grit and was Gramling's immediate supervisor during the three years prior to his death. Harding testified that until advertising salesmen "have made their draw, they're not paid a commission.... [T]hey are commissioned at twelve percent on everything over their draw ..." (T. Harding deposition, p. 10)

John Brockway is Harding's immediate supervisor, and he, also, characterized Gramling's compensation as a "draw or base pay plus a commission", not an advance or a loan against commissions. (J. Brockway deposition, pp. 2, 11 and 34–35)

The testimony of Pasnello, Harding, and Brockway, however, conflicts with other statements they made and with certain documentary evidence. Brockway, for example, characterized the salesmen's draw as "base pay" which they are required to earn. (J. Brockway deposition, p. 11). This characterization suggests that the draw is not a base salary as he, Pasnello and Harding testified, but that it is, as plaintiff contends, a draw against commissions earned. Brockway elaborated at one point, explaining what transpires if the salesman fails to earn enough in commissions to offset his weekly draw. He agreed with plaintiff's counsel when asked whether Grit premises payment of a draw on the expectation that the employees will "meet their draw"—in other words, that they will sell enough advertising space to generate at least the amount of their draw in commissions. (J. Brockway deposition, pp. 36–37) He then explained, however,[8] that if a salesman routinely fails to earn enough in commissions to offset his weekly draw, Grit does not require him to repay the draw, but instead would probably dismiss him from its employ—because his routine failure to earn his draw is a strong indication that he is simply not meant to be a salesperson, and that he is not someone who will do well in the position, and that the departing employee would probably not be required to pay back the amount by which his draw exceeded commissions. (J. Brockway deposition, pp. 11–12 and 34–38)

Other testimony from Pasnello and Brockway regarding eligibility for pay increases also supports plaintiff's position. Pasnello testified that salesmen like Gramling are treated differently than other Grit employees in terms of eligibility for pay increases. Pasnello testified that, although other Grit employees are eligible for annual pay reviews based on job performance, salesmen are not because they are compensated in a different manner. (M. Pasnello deposition, pp. 161–62)

---

**8.** See note 9 *infra.*

Brockway made statements to the same effect. In response to questioning by plaintiff's counsel about annual wage increases, Brockway testified:

Q. Do you have any involvement in the determination of whether Grit employees in the Sunday Grit operation other than sales representatives receive annual wage increases?

A. Yes.

Q. And is that related primarily to the individual employee's job performance?

A. They're recommended by the various department heads who these employees would report to and who report ultimately to me and there are suppose [sic] to be merit increases or job related increases, yes. We also take into consideration cost of living.

Q. Were there any such adjustment during your tenure as manager for the sales representative?

A. No.

Q. Why is that?

A. They're paid a different way. The idea with the sales representative is to as much as possible have them paid by the incentive of commissions. (J. Brockway deposition, pp. 32–33)[9]

This distinction made by both Pasnello and Brockway would appear to be an acknowledgement that salesmen are compensated on a different basis than other employees—a distinction which supports plaintiff's contention that salesmen do not receive a base salary, unlike salaried or hourly-wage employees. The fact that Gramling's weekly draw did not change since at least 1981 suggests the same conclusion. (M. Pasnello deposition, pp. 162–63) If the draw is, in fact, a base salary, it would seem incongruous that it had not been increased for seven years, to at least keep pace with the rate of inflation.

■ There is also documentary evidence supporting the conclusion plaintiff urges. Grit generally distributes information to its employees once a year informing them of the benefits to which they are entitled. The booklet issued to Gramling in 1987[10] (Pasnello deposition exhibit 7) states that his life insurance beneficiary is entitled to receive a benefit of $72,000.00 upon his death.[11] (M. Pasnello deposition, pp. 65–66) Although ERISA does not permit a plaintiff to rely on language in an informational

---

**9.** Brockway went on to explain that the sales positions are not "one hundred percent commission" (J. Brockway deposition, pp. 33–34), but this characterization is at odds with his other statements.

We acknowledge the possibility that the supervisors' statements are consistent with defendant's position that sales representatives are paid a base salary plus commissions, and that the various statements, which we perceive to be inconsistent with that position, are merely different ways of expressing the same concept. It is possible to interpret their statements as consistent with the concept that a base salary is paid if we make certain assumptions about how the system worked.

We find, however, that the ambiguity of the statements, coupled with documentary evidence (noted below) which suggests a contrary result are sufficient to raise a factual issue.

**10.** Coverage under Security Mutual's plan did not begin until April, 1988. During 1987, coverage was provided under another plan issued by Connecticut Life Insurance Company. (M. Pasnello deposition, pp. 16 and 137) The coverage afforded and the formula used to calculate life insurance benefits were substantially the same, and as we have noted elsewhere, Grit freely admits that it was its intent to secure the same coverage and benefits under the Security Mutual plan as its employees had under the prior plans.

**11.** This conflicts with the information in the booklet prepared for Gramling the following year. The 1988 booklet (Pasnello deposition exhibit 6) which Gramling never received due to his illness, states that his beneficiary will receive a life insurance benefit of $26,000.00. (M. Pasnello deposition, p. 86) Defendants contend that both the 1987 and the 1988 statements were in error. (Record Document No. 45, p. 16)

Both the 1987 and 1988 booklets contain a disclaim which states:

... [E]very effort has been made to provide you with an accurate statement. However, the final determination of eligibility and benefits will be determined by the actual plans or legal documents which describe the plan. If you have any questions about the accuracy of a specific benefit amount or other information in your statement, please contact the Personnel Department.

(Pasnello deposition exhibits 6 and 7)

booklet containing a disclaimer which conflicts with the language of the plan, such evidence is relevant, at summary judgment stage, to raise a material issue of fact when offered in conjunction with other evidence which suggests that defendants' assertion of facts may not be correct. Cf. *Tinsley v. General Motors Corp.*, 622 F.Supp. 1547, 1552 (N.D.Ind.1985).

Pasnello's and Harding's testimony is also at odds with documents prepared with respect to Gramling's coverage under earlier insurance plans. Evidence as to the calculation of benefits under earlier plans is relevant, because Grit has stated that it was its intent in obtaining coverage from Security Mutual, to give employees the same coverage and benefits as they had had under previous plans. (M. Pasnello deposition, pp. 169–70 and Pasnello deposition exhibit 19) From April, 1981 through March, 1985, Grit employees were covered under a life insurance plan issued by Hartford Life Insurance Company (Pasnello deposition, pp. 13–17 and exhibits 3 and 4), which contained a clause substantially similar to the one at issue in the Security Mutual policy, stating that employee life insurance benefits were calculated on the basis of "base earnings", defined as "your compensation, exclusive of overtime pay, bonuses or any other form of additional compensation." (Pasnello deposition exhibits 3 and 4) The group insurance enrollment card for the Hartford plan states that Gramling's weekly wage is $297.31. (M. Pasnello deposition, pp. 97, 168–69 and Pasnello deposition exhibit 23) This figure obviously include Gramling's commissions as well as his weekly draw (which was $250.00 per week at that time).

A data collection sheet prepared by Stauffer Communications, apparently in connection with coverage under the Connecticut Life Insurance plan, also included commissions in the calculation of Gramling's 1986 "base pay". (Pasnello deposition exhibit 15) The data sheet states that Gramling's base pay is the same as his "gross pay", $17,919.84.[12]

The evidence discussed is clearly sufficient to raise an issue of material fact as to the character of Gramling's compensation. Summary judgment is, therefore, inappropriate. The case will be listed for non-jury trial.

#### D. Motion by plaintiff to compel discovery

Plaintiff has filed a motion to compel the Grit defendants to produce documents requested pursuant to Fed.R.Civ.P. 37. In her motion, plaintiff agreed to limit substantially her requests for certain documents and groups of documents. Defendants' response (Record Document No. 78) to the motion indicates that most of the documents requested in plaintiff's revised requests for production have already been provided, and that to the extent this is not the case, responsive documents available to defendants will be provided voluntarily in accordance with the revised request. Based on these representations, we will grant plaintiff's motion in part. The Grit defendants will be directed to provide plaintiff with the documents sought in her revised request for production to the extent they have not already done so.

#### E. Motion to amend by Grit defendants

The Grit defendants have filed a motion to amend their response to plaintiff's request for admissions pursuant to Fed.R. Civ. 36(b). Rule 36(b) provides in relevant part:

> Subject to the provision of Rule 16 governing amendment of a pre-trial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

---

**12.** We note that this, again, conflicts with the information stated on a data collection sheet for the following year. The 1987 data sheet states that Gramling's "gross pay" for the year was $23,019.61, and his "base pay" was $13,000.00. (Pasnello deposition exhibit 14)

Defendants seek to modify only a portion of one response in which they admit that Gramling's compensation consisted "exclusively of commissions on sales of advertising". As stated in our discussion on the parties' summary judgment motions, the nature of Gramling's compensation is a critical factual issue which determines the outcome of the case.

Defendants have stated a sound reason for granting their motion to amend based on confusion generated by the manner in which the request for admission was presented. Additionally, plaintiff has not demonstrated any material prejudice that will result if defendant's motion is granted.

We will, therefore, enter an order granting the motion.

## ORDER

For the reasons stated in the accompanying memorandum, IT IS ORDERED THAT:

1. The motion (Record Document No. 39, filed November 1, 1990) for summary judgment by Security Mutual is denied.

2. The motion (Record Document No. 37, filed November 1, 1990) for summary judgment by the Grit Publishing Group, Grit Publishing Company Group Insurance Plan, Stauffer Communications, Inc. ("Grit defendants") is denied.

3. The motion (Record Document No. 67, filed December 12, 1990) to compel discovery filed by plaintiff is granted to the extent of the relief provided herein and in the accompanying memorandum.

4. The motion (Record Document No. 69, filed December 12, 1990) filed by the Grit defendants to amend a response to plaintiff's request for admissions is granted. Defendants may file an amended response to plaintiff's request for admissions within ten days from the date of this order.

5. The case is placed on the September, 1991 non-jury trial list, with the date to be set at the pre-trial conference.

6. The final pre-trial conference will be held on August 30, 1991, at a time to be announced, in Room 409, Federal Building, 240 West Third Street, Williamsport, Pennsylvania.

7. At the pre-trial conference, the court will, inter alia, review the scope of the evidence to be presented at trial, with the object of confining the evidence to that which is strictly relevant to the issue before the court, namely, the primary issue of whether Grit paid Gene Gramling a base salary augmented by commissions or compensated him exclusively by commission on advertising sales.